IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

```
                              :
WG/WELCH MECHANICAL CONTRACTORS,
LLC                           :

    v.                        :   Civil Action No. DKC 22-2296

INTERNATIONAL ASSOCIATION OF  :
SHEET METAL, AIR, RAIL &
TRANSPORTATION WORKERS, LOCAL :
UNION 100 – SHEET METAL
DIVISION, et al.              :
```

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this labor law case is the motion to dismiss filed by Defendants Richard LaBille, III ("Mr. LaBille"); Charles Sewell ("Mr. Sewell"); and David Goetzke ("Mr. Goetzke") (collectively, "Individual Defendants"); and International Association of Sheet Metal, Air, Rail & Transportation Workers, Local Union 100-Sheet Metal Division ("Local 100") (collectively with Individual Defendants, "Defendants"). (ECF No. 32). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be granted.

## I. Background

The following facts and allegations are set forth in the amended complaint and construed in the light most favorable to Plaintiff.

Plaintiff WG/Welch Mechanical Contractors, LLC ("WGW") is a mechanical contractor that provides construction services to residential property developers, or through general contractors managing such construction services, in Maryland, Virginia, and the District of Columbia.  (ECF No. 29 ¶ 8).  WGW is a non-union employer in that it does not employ any union workers, does not draw labor from local union halls, and has never been a signatory to any collective bargaining agreement.  (*Id.* ¶ 9).  Local 100 is the union for sheet-metal trades workers in the Maryland, Virginia, and District of Columbia jurisdictions.  (*Id.* ¶ 11).

"Beginning in the early months of 2020, [] Local 100 began taking actions directed at WGW, first, and later at its customers. WGW had no actual labor or organizing dispute with Local 100 during times relevant to this action."  (*Id.* ¶ 13).  WGW "believe[s] and aver[s]" that Local 100's agents, Mr. LaBille, Mr. Sewell, and Mr. Goetzke, "conspired together to cause reputational harm to WGW and to interfere with its existing and prospective business relationships."  (*Id.* ¶ 14).  Initially, Local 100 passed out "leaflets, handbills, and other materials at jobsites," but its actions soon "evolved into more concerted, unlawful acts."  (*Id.* ¶ 15).  "By the end of 2020, Local 100 . . . began targeting WGW's customers and general contractors by supplying them with accusatory, false[,] and defamatory materials and information. Local 100 also targeted WGW's lower tier subcontractors that

supplied labor and services on various construction sites." (*Id.* ¶ 16). These actions "were not designed to foster union participation or affiliation, but were instead made to demonize a legitimate business and harm its existing and prospective relationships with its customers, development project owners and general contractors." (*Id.* ¶ 17). "[T]hese actions have also been directed at causing investigations with the Office of Attorney General of the District of Columbia and civil litigation." (*Id.*).

WGW asserts "[i]t is believed . . ." that the following actions were "taken solely to cause WGW financial and reputational harm[:]"

> Local 100 began soliciting a subcontractor, Reyes Plumbing, which had defaulted on the performance of its contracted work with WGW. Upon information and belief, Local 100 engaged attorneys for Reyes and prompted, aided or abetted them, in filing false reports with oversight agencies and in court filings. These efforts were an attempt by Local 100 to falsely paint WGW as using "labor brokers" to misclassify workers and avoid wage and hour and tax liabilities. It is believed and averred that Local 100 also aided and abetted Abriel Hernandez, owner of Mechanical Plumbing Crew, a lower-tier subcontractor, in advancing false and malicious claims against WGW for labor brokering.

(*Id.* ¶ 18).

Although "Defendants knew that WGW did not commit any . . . employment law violations, on or about April 27, 2022, Defendants mailed notices to WGW's customers which have

construction contracts with WGW." (*Id.* ¶ 19). This constituted an "effort to maximize financial harm to WGW and followed their campaign to vilify and malign WGW in the media, to the business community[,] and with government agencies." (*Id.*). The letter states, in relevant part:

> Please be aware that W.G./Welch Mechanical Contractors LLC – a contractor working on the construction of your Sunrise Senior living center on 1515 Chain Bridge Road, McLean, VA[] and Sunrise Senior living center 308 Maple Avenue East, Vienna, VA[] – has a concerning record of potential employment law violations. Specifically, W.G./Welch has been accused of failing to pay area standard wages, not paying employees in a timely manner, and misclassifying employees as independent contractors.
>
> The Attorney General's office for the District of Columbia is currently investigating W.G./Welch and one of its subcontractors, Mechanical Plumbing Crew Co., for alleged violations of D.C. employment laws, including the Minimum Wage Revision Act, the Sick and Safe Leave Act, the Living Wage Act, the Workplace Fraud Act, and/or the Wage Theft Prevention Amendment Act. These laws protect employees from wage and safety abuses, as well as from being misclassified as independent contractors.
>
> W.G./Welch is also being sued in the Superior Court for the District of Columbia for allegedly violating the D.C. Minimum Wage Law, failing to timely pay wages, and misclassifying employees as independent contractors in violation of the D.C. Workplace Fraud Act.
>
> The *Washington Hispanic* recently reported on W.G./Welch's actions. That article is attached.

> We want to make sure you are aware that
> W.G./Welch has a concerning record when it
> comes to the treatment of its workers. If you
> have any questions or would like to discuss
> this issue in more detail, please do not
> hesitate to contact me.

(*Id.* ¶ 21; *see also* ECF No. 29-1). Local 100 sent this letter with "intent, purpose, and malice, so as to damage an existing business relationship." (ECF No. 29 ¶ 22). "Local 100 sent similar letters to other neutral third parties to damage existing and prospective businesses relationships." (*Id.* ¶ 22). WGW believes and avers that Local 100 itself "directly initiated" "the legal matters which [it] relates in the letter[,]" rendering "Local 100's relation of these matters . . . disingenuous, false[,] and done with the specific intention of coercing WGW's customers not to work with WGW." (*Id.* ¶ 23).

WGW alleges upon information and belief that "Local 100 caused Aluira and Moreno[][1] to initiate the legal proceedings from the Superior Court for the District of Columbia by targeting potential plaintiffs, arranging for their legal counsel and advancing payment for litigation expenses, and contriving material misstatements of fact that were include[d] in pleadings filed in that litigation." (*Id.* ¶ 24). WGW believes and avers that "Local 100 initiated the complaint with the Office of Attorney General to

---

[1] The amended complaint does not provide full names for "Aluira and Moreno" or explain who they are.

give facial appearance of legitimacy to the false claims asserted in the letter[]" and "coordinated and otherwise arranged for the story related in the article in the *Washington Hispanic*." (*Id.* ¶ 25).

WGW has "suffered loss of business opportunities[,]" "incurred significant financial losses to defend against the orchestrated and false legal proceedings fund[ed] and directed by Local 100[,]" and "suffered an actual loss of $ 10,563,883.00 in annual revenue for the Fiscal Year 2022 due to declining sales attributable to Local 100's malicious campaign to damage WGW's financial relations." (*Id.* ¶ 26).

WGW filed a complaint against Defendants on September 12, 2022, alleging exclusively state law claims and asserting diversity jurisdiction. (ECF No. 1). On December 16, 2022, Defendants filed a motion to dismiss for failure to state a claim. (ECF No. 18). WGW filed an opposition on December 29, 2022, (ECF No. 20), and Defendants filed a reply on January 12, 2023, (ECF No. 21). On June 23, 2023, the court ordered the parties to provide the states of citizenship of Local 100's members and for each of the individual Defendants to determine whether diversity jurisdiction exists. (ECF No. 22). On June 30, 2023, Defendants filed a response stating that 34 of its 2,761 members reside in Pennsylvania, where WGW's members hold citizenship, but that "[e]ven if diversity is lacking, the Court has subject matter

jurisdiction under 28 U.S.C. § 1331 because Section 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187, completely preempts [WGW's] state-law claims and transforms them into claims arising under federal law."  (ECF No. 23, at 1, 2).  On July 6, 2023, the court directed WGW to respond to Defendants' arguments.  (ECF No. 24).

On July 20, 2023, WGW filed a response asserting that it is unable to ascertain citizenship of Local 100's members who reside in Pennsylvania and that its claims raise a federal question of potential preemption.  (ECF No. 26, at 2-4).  WGW requested that the court "issue an order directing Defendants to provide sufficient information concerning the citizenship of the purported twenty-one Pennsylvanians, or, in the alternative, to grant [it] leave to amend its complaint."  (*Id.* at 4).  On July 28, 2023, the court issued a memorandum opinion and order dismissing the complaint because WGW had failed to establish subject matter jurisdiction on either diversity or federal question grounds and granting leave to file an amended complaint that sufficiently alleges the basis for federal jurisdiction.  (ECF Nos. 27; 28).

On August 18, 2023, WGW filed an amended complaint alleging at least one federal claim.  (ECF No. 29).  On September 15, 2023, Defendants filed a motion to dismiss for lack of jurisdiction and failure to state a claim.  (ECF No. 32).  WGW filed a response in

opposition on October 13, 2023, (ECF No. 35), and Defendants filed a reply on October 27, 2023, (ECF No. 36).

## II.  **Standard of Review**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint.  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  "[T]he district court must accept as true all well-pleaded allegations and draw all reasonable factual inferences in plaintiff's favor." *Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021).  A plaintiff's complaint needs only satisfy the standard of Rule 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed.R.Civ.P. 8(a)(2)). A Rule 8(a)(2) "showing" requires "stat[ing] a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Mays*, 992 F.3d at 299-300 (quoting *Iqbal*, 556 U.S. at 663).  Legal conclusions couched as factual allegations are insufficient, *Iqbal*, 556 U.S. at 678, as are conclusory factual

8

allegations devoid of any reference to actual events, *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

## III. Analysis

WGW brings the following claims in the amended complaint, each against all Defendants:

> 1) Violation of § 8(b) of the National Labor Relation Act ("NLRA"), *as amended* § 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187
> 2) Civil Conspiracy to Violate the National Labor Relations Act
> 3) Defamation/Defamation Per Se

(ECF No. 29).

### A. Information and Belief Pleading

Many of WGW's allegations are "believed and averred" and made "on information and belief." As has been stated before: "Under the pleading standard the Supreme Court of the United States articulated in *Twombly* and *Iqbal*, a complaint's conclusory allegations based solely 'upon information and belief' are 'insufficient to defeat a motion to dismiss.'" *Van Buren v. Walmart, Inc.*, 611 F.Supp.3d 30, 36-37 (D.Md. 2020), *aff'd*, 855 F.App'x 156 (4th Cir. 2021) (quoting *Harman v. Unisys Corp.*, 356 F.App'x 638, 640-41 (4th Cir. 2009)). Further,

> As Judge Grimm has noted, it is important to differentiate "between a case in which pleading 'upon information and belief' is used as an inadequate substitute for providing detail as to why the element is present in an action ... [and the] proper use of 'upon information and belief,' where a plaintiff does not have personal knowledge of the facts being

asserted." *Malibu Media*, 2014 WL 7188822, at *4 (citations and internal quotation marks omitted). "'[P]leading on the basis of information and belief is generally appropriate' where information is 'particularly within defendants' knowledge and control.'" *Kajoshaj v. N.Y.C. Dept. of Educ.*, 543 F.App'x 11, 16 (2d Cir. 2013) (quoting *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008)).

*Id.* at 37.

Even if information is "particularly within defendants' knowledge and control," conclusory pleading is not permitted: "Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff *but he has sufficient data to justify interposing an allegation on the subject*." 5 C. Wright & A. Miller, Federal Practice and Procedure § 1224 (3d ed., April 2019 update) (emphasis added).

As will be discussed below, WGW's amended complaint relies far too heavily on "information and belief" without including sufficient substantive facts to support the information and beliefs alleged.

## B. Count I: NLRA Section 303

In Count I, WGW alleges that Defendants violated § 8(b)(4)(B) of the NLRA by "engag[ing] in conduct specifically intended and directed to third parties to damage [WGW's] existing and prospective business relationships, so as to cause economic harm." (ECF No. 29 ¶ 31).

Section 158(b)(4)(ii)(B) of the NLRA provides that

> [i]t shall be an unfair labor practice for a
> labor organization or its agents . . . to
> threaten, coerce, or restrain any person
> engaged in commerce or in an industry
> affecting commerce, where . . . an object
> thereof is . . . forcing or requiring any
> person to cease using, selling, handling,
> transporting, or otherwise dealing in the
> products of any other producer, processor, or
> manufacturer, or to cease doing business with
> any other person[.]

29 U.S.C. § 158(b)(4)(ii)(B). Section 303(a) of the LMRA, in turn, provides that "[i]t shall be unlawful . . . for any labor organization to engage in any activity or conduct defined as an unfair labor practice" under § 8(b)(4) of the NLRA. 29 U.S.C. § 187(a). Section 303(b) provides a private right of action for "[w]hoever shall be injured in his business or property by reason or any violation of subsection (a)[.]" 29 U.S.C. § 187(b).

Defendants argue that Count I must be dismissed against the Individual Defendants either because Section 303 does not provide the court with subject matter jurisdiction over such claims against individuals, or because the statute does not provide a remedy against individuals and thus WGW fails to state a claim. (ECF No. 32-1, at 9-11). In its opposition, WGW concedes that individuals are not subject to section 303 claims and stipulates that the Individual Defendants should be dismissed from Count I. (ECF No. 35, at 9).

Because only a labor organization can violate § 303(a), an individual member of a union cannot be held liable under § 303(b). *See, e.g.*, *Lab. Ready Mid-Atl., Inc., v. Tri-State Bldg. & Constr. Trades Council*, No. 2:99-cv-0037, 2001 WL 1358708, at *7 (S.D.W.Va. Sept. 21, 2001) (explaining that section 303 "liability is limited to labor unions, not individual members[]"); *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014) (noting that "a § 303 claim cannot be brought against a union member in his individual capacity[]"); *Prater v. United Mine Workers of Am., Districts 20 & 23*, 793 F.2d 1201, 1207 (11th Cir. 1986) ("Section 303 . . . limits recovery against the union to the organization and its assets and forbids any recovery from the individual union members."). Hence, Count I will be dismissed against Individual Defendants.

WGW also alleges Count I against Local 100. Defendants argue that the means allegedly utilized by Local 100 are purely expressive in nature and are not proscribed by § 8(b)(4), and that WGW has not alleged that Local 100 engaged in any threatening, coercive, or restraining conduct. (ECF No. 32-1, at 11-18). WGW responds that the determination of whether a union's objective was forcing others to cease doing business with a company is a question of fact inappropriate on a motion to dismiss. (ECF No. 35, at 11) (citing *F.A. Wilhelm Const. Co. v. Ky. State Dist. Council of Carpenters, AFL-CIO*, 293 F.3d 935, 940 (6th Cir. 2002); *N.L.R.B.*

*v. Int'l Bhd. of Elec. Workers, Loc. 265*, 604 F.2d 1091, 1097-98 (8th Cir. 1979); *R.L. Coolsaet Const. Co. v. Loc. 150, Int'l Union of Operating Engineers*, 177 F.3d 648, 655 (7th Cir. 1999); *Fid. Interior Const., Inc. v. Se. Carpenters Reg'l Council of United Bhd. of Carpenters & Joiners of Am.*, 675 F.3d 1250, 1259-60 (11th Cir. 2012)).  WGW also asserts that Local 100's activities were coercive because "Local 100 engaged in a maliciously contrived campaign to publish false accusations of labor law violations, wage theft and other illegal conduct to specific customers to strategically damage Welch, which is conduct prohibited under [*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 578 (1988)]."  (*Id.* at 12).

To state a claim for violation of § 8(b)(4)(ii)(B), a plaintiff must allege facts plausibly showing that a labor organization "threaten[ed], coerce[d], or restrain[ed]" a neutral person where "an object thereof is . . . forcing or requiring [that] person . . . to cease doing business with" the primary employer. 29 U.S.C. § 158(b)(4)(ii)(B).  A union does not violate Section 8(b)(4)(ii)(B) if its conduct is not threatening, coercive, or restraining, regardless of its objectives. *DeBartolo*, 485 U.S. at 578 ("[M]ore than mere persuasion is necessary to prove a violation of § 8(b)(4)(ii)(B): that section requires a showing of threats, coercion, or restraints.").

WGW alleges that Local 100: (1) passed out leaflets, handbills, and other materials at jobsites; (2) solicited Reyes Plumbing, a subcontractor, and engaged attorneys and prompted, aided, or abetted them in filing reports with oversight agencies on behalf of Reyes Plumbing; (3) aided and abetted Abriel Hernandez, the owner of a subcontractor, in advancing claims for labor brokering; (4) mailed notices to WGW's customers; (5) initiated the legal matters relayed in the notice including by causing Aluira and Moreno to initiate legal proceedings in the Superior Court of the District of Columbia by targeting potential plaintiffs, arranging for their legal counsel, advancing payment for litigation expenses, and contriving misstatements of fact included in pleadings, and by initiating the complaint with the Office of Attorney General; and (6) coordinated and otherwise arranged for the story relayed in the *Washington Hispanic* article. (ECF No. 29 ¶¶ 15-25). WGW has not alleged that Local 100's actions were accompanied by violence, picketing, patrolling, or that Local 100 in any way engaged in threats, coercion, or restraint.

First, some of these alleged actions are attributed to Local 100 only on "information and belief." There are absolutely no underlying substantiating facts alleged.

Second, leafletting or handbilling in order to persuade customers not to do business with a company does not by itself

constitute coercion.   *DeBartolo*, 485 U.S. at 580-81, 588. Handbilling is only actionable if it "'threaten[ed], coerce[d], or restrain[ed] any person' to cease doing business with another." *Id.* at 578.   Thus, for example, handbilling accompanied by "violence, picketing, patrolling, or other intimidating conduct" is actionable.   *Id.*; *see also 520 S. Mich. Ave. Assocs., Ltd. v. Unite Here Loc. 1*, 760 F.3d 708, 719 (7th Cir. 2014) ("[H]andbilling involves 'no violence, picketing, or patrolling and only an attempt to persuade customers not to shop.'  Such violence, picketing, or patrolling against neutral actors in a labor dispute is not protected under federal law or the First Amendment." (quoting *DeBartolo*, 485 U.S. at 580)).   Even if Local 100's alleged handbilling caused customers or potential customers not to do business with WGW, "[t]he loss of customers because they read a handbill urging them not to patronize a business, and not because they are intimidated by a line of picketers, is the result of mere persuasion,"—not coercion.  *DeBartolo*, 485 U.S. at 580.

WGW does not allege any facts regarding the handbilling other than that Local 100 "pass[ed] out leaflets, handbills and other materials at jobsites[.]"  (ECF No. 29 ¶ 15).  It has not alleged any facts showing that the handbilling was accompanied by violence, picketing, or patrolling. *See All-City Metal, Inc. v. Sheet Metal Workers' Int'l Ass'n Loc. Union 28*, No. 18-cv-958-RRM-SJB, 2020 WL 1502049, at *7 (E.D.N.Y. Feb. 18, 2020), *report and recommendation*

*adopted*, No. 18-cv-958-RRM-SJB, 2020 WL 1466017 (E.D.N.Y. Mar. 25, 2020) ("Without any information about what the flyers say, how the flyers were used, or when they were distributed, there is no basis to infer that their use by Local 28 had any coercive or threatening effect."); *Compass Const. v. Indiana/Kentucky/Ohio Reg'l Council of Carpenters of United Bhd. of Carpenters & Joiners of Am.*, 890 F.Supp.2d 836, 844 (S.D.Ohio 2012) ("[P]laintiffs have not alleged, apart from threadbare, conclusory recitals, that defendants' handbilling, bannering, or letter to Net Jets was accompanied by violence, picketing, patrolling, or that defendants' activity in any way constituted threatening, coercing, or restraining activity violative of § 8(b)(4)(ii) of the NLRA or Section 303 of the LMRA."). Thus, WGW has failed to allege sufficient facts to show that Local 100's handbilling constituted a threat, coercion, or restraint under § 8(b)(4)(ii)(B).

Third, given the First Amendment right to access the courts, initiating legal proceedings is only considered an unfair labor practice when the suit is "based on insubstantial claims" meaning, suits that lack a "reasonable basis" or are based on "intentional falsehoods." *Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 741-43 (1983). WGW's allegations that the legal filings that Local 100 purportedly initiated or helped initiate were "false," "malicious," and contain "material misstatements of fact," (ECF No. 29 ¶¶ 18-19, 23-25), are conclusory statements. WGW's

allegations are based on "information and belief," and WGW has not alleged enough facts to support its allegations either that Local 100 was in fact involved or that the legal filings lacked a "reasonable basis" or were based on "intentional falsehoods." *Bill Johnson's Rests.*, 461 U.S. at 743; *see also Prime Healthcare Servs., Inc. v. Servs. Emps. Int'l Union*, 97 F.Supp.3d 1169, 1196-97 (S.D.Cal. 2015) (concluding that the plaintiff's allegation that the union had backed a lawsuit against it did not sufficiently allege facts showing coercive conduct). Consequently, WGW's allegations that Local 100 initiated and helped others initiate lawsuits and file complaints with the Office of the Attorney General are insufficient to show that Local 100 engaged in a threat, coercion, or restraint under § 8(b)(4)(ii)(B).

Fourth, "letter writing . . . has even fewer potentially coercive, threatening, or restraining characteristics than does even handbilling or other in-person communication, and has been held, albeit in other contexts, to enjoy correspondingly greater First Amendment protection." *George v. Nat'l Ass'n of Letter Carriers*, 185 F.3d 380, 391-92 (5th Cir. 1999) (citing *Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466, 474-77 (1988)). WGW alleges that Local 100 mailed notices to its customers stating that WGW "has a concerning record of potential employment law violations" and referencing the Office of the Attorney General's investigation, Superior Court lawsuit, and *Washington Hispanic*

17

article. (ECF No. 29 ¶¶ 19-21). Such allegations are insufficient to show that the letters could be threatening, coercive, or restraining. *See, e.g.*, *CP Anchorage Hotel 2, LLC v. Unite Here! Loc. 878*, 558 F.Supp.3d 800, 815 (D.Alaska 2021), *aff'd*, No. 21-35827, 2022 WL 2953697 (9th Cir. July 26, 2022) (holding that sending letters did not constitute an unfair labor practice because the court could "find no authority that the Union is prohibited from sending an email, tweet, or letter to anyone for whom it found an address[]"); *Compass*, 890 F.Supp.2d at 842 (holding that the plaintiff made no factual allegations that the union's mailing of letters constituted a threat, restraint, or coercion).

Finally, arranging for publication of a newspaper article arguing not to patronize a business does not constitute an unfair labor practice. *See DeBartolo*, 485 U.S. at 583-88; *Hasbrouck v. Sheet Metal Workers Loc. 232*, 586 F.2d 691, 694 (9th Cir. 1978) (holding that the publication of a "Do Not Patronize" list in a newspaper, where a labor dispute existed, "was not an unfair labor practice under section 8(b)(4) and could not give rise to a cause of action under section 303[]"); *cf. George v. Nat'l Ass'n of Letter Carriers*, 185 F.3d 380, 388 (5th Cir. 1999) ("The legislative history [of § 8(b)(4)(ii)(B)] reflected no intent to ban handbilling or other nonpicketing appeals such as newspaper or radio ads."). WGW alleges, again only based on "belief," that Local 100 "coordinated and otherwise arranged for the story related

18

in the article in the *Washington Hispanic*[,]" (ECF No. 29 ¶ 25),
but does not allege any facts showing that the publication was
threatening, restraining, or coercive, or that Local 100 was
responsible for coordinating the publication.

WGW's reliance on *F.A. Wilhelm Construction*, *International
Brotherhood of Teamsters*, *R.L. Coolsaet Construction*, and *Fidelity
Interior Construction* is misplaced.  (ECF No. 35, at 11) (citing
*F.A. Wilhelm Const*, 293 F.3d at 940; *Int'l Bhd. of Elec. Workers*,
604 F.2d at 1097-98; *R.L. Coolsaet Const.*, 177 F.3d at 655; *Fid.
Interior Const.*, 675 F.3d at 1259-60).  These cases each involve
picketing, which is not alleged here, and do not address a motion
to dismiss.  The *F.A. Wilhelm Construction*, *R.L. Coolsaet
Construction*, and *Fidelity Interior Construction* courts did not
need to consider the "threaten, coerce, or restrain" element of
§ 8(b)(4)(ii)(B) because it was undisputed that the unions had
engaged in picketing.  The *International Brotherhood of Teamsters*
court did not address § 8(b)(4) at all.

WGW's argument that Local 100's activities were coercive
because Local 100 created a controversy by spreading false
information to regulatory bodies and courthouses through
litigation fares no better.  (ECF No. 35, at 12-14).  "[F]alse or
fraudulent speech might be defamatory and might fall outside the
protections of the First Amendment, but that does not mean it alone
constitutes 'coercion.'"   *Gold v. Mid-Atl. Reg'l Council of*

*Carpenters*, 407 F.Supp.2d 719, 729 (D.Md. 2005) (citing *Kohn v. Sw. Reg'l Council of Carpenters*, 289 F.Supp.2d 1155, 1168 (C.D.Cal. 2003) (noting that the plaintiff's argument that "the union's use of fraudulent language on the banner . . . constitutes unlawful coercive activity within the meaning of § 8(b)(4)(ii)(B)[]" is an "odd" one because "§ 8(b)(4)(ii)(B) does not specifically prohibit fraudulent speech, but only threatening, coercive, or restraining conduct[]"); *see also United Brotherhood of Carpenters & Joiners of America, Local Union No. 1506*, 355 N.L.R.B. 797, 811 (2010) ("[A] holding that the banner displays violated Section 8(b)(4)(ii)(B) because of their purported falsity would raise serious constitutional questions of its own."). The contention that Local 100's activities were different from those in other cases involving unions initiating litigation, handbilling, mailing letters, or publishing articles because Local Union itself "created the controversy" fails because section 303 of the LMRA creates a cause of action for violations of § 8(b)(4) of the NLRA, which does not make unlawful anything akin to "creating a controversy."

WGW has not alleged sufficient facts to demonstrate plausibly that Local 100 engaged in any threats, coercion, or restraint. Thus, it is unnecessary to consider whether WGW has alleged facts demonstrating that Local 100's objective was forcing others to cease doing business with WGW. 29 U.S.C. § 158(b)(4)(ii)(B). Both

prongs are necessary to state a claim under section 8(b)(4)(ii)(B). Accordingly, Count I will be dismissed.

### C. Count II: Civil Conspiracy to Violate the NLRA

In Count II, WGW alleges that Defendants engaged in a civil conspiracy to violate the NLRA "by agreeing to unlawfully and tortiously interfere with Plaintiff's existing and prospective business relationships in contravention of Section 8(b)(4)(B), so as to cause economic and other compensable damages, and took actions in furtherance of said conspiracy." (ECF No. 29 ¶ 34).

Defendants assert that § 303 of the LMRA preempts Count II because the state law claim in Count II concerns the exact same alleged secondary activities underlying its § 303 claim in Count I. (ECF No. 32-1, at 18-20). WGW responds that Count II is pleaded as a federal claim, not a state tort claim. (ECF No. 35, at 15). Defendants reply that there is no federal common law and WGW has not pointed to a federal statutory provision creating a cause of action for civil conspiracy to violate the NLRA. (ECF No. 36, at 13-14).

Defendants are correct that there is no federal cause of action for civil conspiracy to violate the NLRA. *Abrams v. Carrier Corp.*, 434 F.2d 1234, 1253 (2$^d$ Cir. 1970) ("[T]here exists no federal statute conferring independent jurisdiction upon the federal courts for claims of civil conspiracy in the labor relations field[.]") (citing *Hall v. Pac. Mar. Ass'n*, 281 F.Supp.

54, 61 (N.D.Cal. 1968) (concluding that there is no federal claim for civil conspiracy in the labor relations field)); *Cole v. Hall*, 35 F.R.D. 4, 8 (E.D.N.Y. 1964) ("[C]onspiracy offers no basis for a suit under the [Labor-Management Reporting and Disclosure] Act; it is only the violation of the Act which provides the remedy."), *aff'd*, 339 F.2d 881 (2ᵈ Cir. 1965)).  Thus, despite WGW's disavowal, Count II appears to attempt to allege a state law claim because Count II recites the elements for civil conspiracy under Maryland law.  (ECF No. 29 ¶ 33) (citing *Hoffman v. Stamper,* 385 Md. 1, 24-25 (Md. 2005)).

Section 303 of the LMRA preempts state law actions for damages resulting from a union's allegedly unlawful secondary activities. *Loc. 20, Teamsters, Chauffeurs & Helpers Union v. Morton*, 377 U.S. 252, 260-61 (1964).  Under Section 303, a state-law action is preempted if the alleged conduct at issue falls within the purview of § 8(b)(4).  In *Morton*, the Supreme Court of the United States held that the plaintiff's state law claims concerning a union's secondary activities were "displaced by § 303" because allowing the state to regulate such conduct would "frustrate the congressional determination to leave this weapon of self-help available" to unions.  377 U.S. at 260-61.

The allegations that support Counts I and II are exactly the same.  Courts conclude that, when a plaintiff pleads the same facts to allege a violation of the LMRA and a state law claim, § 303

preempts the state law claim. *See, e.g.*, *Smart v. Loc. 702 Int'l Bhd. of Elec. Workers*, 562 F.3d 798, 808 (7th Cir. 2009) ("[S]ection 187(b) completely preempts state-law claims related to secondary boycott activities described in section 158(b)(4); it provides an exclusive federal cause of action for the redress of such illegal activity."); *Martines Palmerio Constr., LLC v. Sw. Reg'l Council of Carpenters*, No. 17-cv-02604-CMA-KLM, 2017 WL 5590213, at *4 (D.Colo. Nov. 21, 2017) ("Plaintiff's state law claim of tortious interference with contract, which this Court has already concluded concerns secondary boycott activities, must be deemed to arise under § 303.   The complete preemption doctrine therefore applies[.]"); *Allstate Interiors Inc. v. Carpenters*, No. 10-cv-2861-S, 2010 WL 3894915, at *4 (S.D.N.Y. Sept. 10, 2010) (holding that claims for Tortious Interference with Prospective Contractual Relations . . . and Prima Facie Tort . . . , which arise from Defendants' alleged secondary boycott activities, are thus completely preempted by Section 303 of the LMRA"); *Adobe Drywall, L.L.C. v. United Bhd. of Carpenters & Joiners of Am., Loc. Union No. 1506*, No. 08-cv-2105-PHX-SRB, 2009 WL 10707035, at *3 (D.Ariz. Feb. 5, 2009) ("Adobe's claims for intentional interference with existing and prospective contractual relations are completely preempted by § 303 of the LMRA[.]").  Because the conduct alleged in Count II falls within the purview of § 8(b)(4) of the NLRA, § 303 preempts Count II.

Defendant argues in the alternative that Count II is also preempted under the Supreme Court case, *San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 245 (1959). (ECF No. 32, at 22-30). The parties devote much time discussing *Garmon* preemption and its defamation exception under *Linn v. United Plant Guard Workers of America, Local 114*, 383 U.S. 53, 64-65 (1966) (ECF Nos. 32, at 22-30; 35, at 17-20; 36, at 16-19).

*Garmon* is inapplicable to the dispute in this case which asserts a claim for alleged secondary boycott activity that may be brought in this court directly under 29 U.S.C. § 187. It only applies to situations "when a labor matter must be brought before the NLRB, a complicated doctrine known as primary jurisdiction." *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 951 (9th Cir. 2014) (*citing Golden State Transit Corp. v. Los Angeles*, 475 U.S. 608, 613 (1986)). Nevertheless, the "*Garmon* principles of labor law preemption underlie *Morton* and its progeny," *Retail Prop.*, 768 F.3d at 951, and can be instructive.[2] It is unnecessary to address *Garmon* preemption and

---

[2] The Ninth Circuit also points out the confusion, or misuse, of certain terms. "Complete" preemption is best reserved for discussions of jurisdictional issues, whereas defensive preemption is referred to as "express," "field," or "conflict" preemption. *Retail Prop.*, 768 F.3d at 947-48.

its exception with regard to Count II because preemption is dictated by *Morton*.  Therefore, Count II will be dismissed.

### D. Count III: Defamation/Defamation Per Se

In Count III, WGW alleges that Defendants engaged in defamation by communicating statements of fact to others that Defendants "knew . . . were false when they communicated them, or communicated them with reckless disregard for their truth or falsity, or acted negligently in failing to ascertain the falsity of the statement before communicating them."  (ECF No. 29 ¶¶ 37-38).  WGW also alleges that "[t]he statements . . . constitute defamation per se in that the statements attribute to [WGW] conduct, characteristics, or a condition that is incompatible with its business or trade."  (*Id.* ¶ 39).  Finally, WGW alleges that "Defendants gave publicity to untrue matters involving [WGW] that placed it before the public in a false light in a manner that is highly offensive to a reasonable person."  (*Id.* ¶ 41).

Defendants argue that Count III is "completely preempted because it is premised on Defendants' letter to Sunrise Senior Living and Local 100's other unspecified statements and activities, all of which [WGW] also claims constitute 'conduct specifically intended and directed to third parties' in violation of Section 303[.]"  (ECF No. 32-1, at 20).  WGW responds that the NLRA does not preempt Count III because "the facts supporting this defamation claim do not convert this case into fundamentally a

25

labor case, but rather a state tort case that complains about the union's conduct."   (ECF No. 35, at 16).

The issue of whether section 303 preempts state law defamation claims is a closer question than that presented by Count II.  The United States Court of Appeals for the Fourth Circuit has not yet addressed this question, and several district courts and circuit courts have disagreed on this issue.  *See, e.g.*, *Omni Elevator Corp. v. Int'l Union of Elevator Constructors*, No. 19-CV-6778, 2021 WL 3810413, at *10 (W.D.N.Y. Aug. 26, 2021)("To the extent the Amended Complaint asserts claims of defamation, tortious interference with prospective business relations, and tortious interference with contracts, they are preempted by LMRA Section 303 and were properly removed to this Court."); *Paramount Enters., Inc. v. Laborers E. Region Org. Fund*, No. CV13-3295, 2015 WL 5778779, at *5 (D.N.J. Sept. 30, 2015) ("[T]he Court finds that because Plaintiffs' allegations of defamation and tortious interference with a business relationship pertain to conduct that is arguably covered by Section 303, Plaintiffs have pleaded a federal claim."); *Silverman v. Verrelli*, No. CIV.A. 11-6576, 2012 WL 395665 (D.N.J. Feb. 7, 2012) (relying on the "Seventh Circuit's holding in *Smart* [*v. Loc. 702 Int'l Bhd. of Elec. Workers*, 562 F.3d 798 (7th Cir. 2009)] and the Supreme Court's strong guidance in *Morton*" and holding that the plaintiff's state law defamation, false light, and invasion of privacy claims "must be deemed to

arise under § 303," so "[t]he complete preemption doctrine applies and supports the removability of Plaintiff's Complaint based on federal question jurisdiction (citing *Smart* 562 F.3d at 801, 808 (analogizing section 303 to section 301 of the LMRA and finding that section 303 preempts plaintiff's state antitrust claim)). *But see Retail Prop. Tr.*, 768 F.3d at 958-9 and 961, n.14 (disagreeing with the Seventh Circuit's holding in *Smart* and finding that there is not field preemption under section 303, but adding in a footnote that state libel actions are preempted for "defamatory statements in labor disputes which were published without knowledge of their falsity or reckless disregard for the truth" (quoting *San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230 (9th Cir. 1997)). If field preemption applies without further analysis, as found by some courts, Count III would be precluded. Even if, however, closer analysis under *Garmon* is required, this claim would fail.

As mentioned earlier, the parties argue whether *Garmon* preemption applies to Count III, and if so, whether the *Linn* defamation exception applies. In *Garmon*, the Supreme Court held that "[w]hen an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board . . . ." *Garmon*, 359 U.S. at 245. As noted above, the *Garmon* doctrine does not apply to secondary activity, but its analysis

27

might inform the analysis under *Morton* as to whether field preemption applies.

WGW argues that Local 100's actions meet an exception to *Garmon*, as set out in *Linn*. In *Linn*, the Supreme Court held that libel claims are an exception to *Garmon* preemption if "the complainant can show that the defamatory statements were circulated with malice and caused him damage." *Linn* 383 U.S. at 64-65. The Court adopted the malice standard from *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964), defining malice as "defamatory statements published with knowledge of their falsity or with reckless disregard of whether they were true or false." *Id.* at 65. Here, WGW's allegations of Local 100's conduct and statements do not include sufficient facts to plead malice properly under the *Linn* exception. Nor are the allegations enough to state a claim for defamation under Maryland law. *See Solomon Found. v. Christian Fin. Res., Inc.*, No. 22-CV-0993-JRR, 2023 WL 3058321 (D.Md. Apr. 24, 2023)(discussing at length the elements of defamation under Maryland law, particularly with regard to a corporate plaintiff.) Plaintiff must allege a defamatory statement that has "a tendency to directly affect its credit or property or cause it pecuniary injury." *Id.* at *3 (quoting *Biospherics, Inc. v. Forbes, Inc.*, 989 F.Supp. 748, 750-51 (D.Md. 1997)).

If *Garmon* preemption analysis is relevant to this case, WGW would need to have alleged malice to meet the *Linn* exception to escape preemption for its defamation claim.  Here, WGW has not properly alleged malice.  As discussed earlier, WGW has not included sufficient facts to support any of its "information and belief" allegations.  The only action specifically tied to Defendants (and only then collectively) is the letter appended as Attachment A to Sunrise Senior Living Center. The recitation of actions by the Attorney General of the District of Columbia, the suit in the Superior Court for the District of Columbia, and the Washington Hispanic article were true and cannot be used in support of a defamation claim.  The letter categorizes these as a "concerning record of potential employment law violations." (ECF No. 29-1).  The letter, by itself, is insufficient to invoke the *Linn* exception. Accordingly, Count III will be dismissed.

**IV.  Conclusion**

For the foregoing reasons, Defendants' motion to dismiss will be granted.  A separate order will follow.

                                        /s/
                             _____
                             DEBORAH K. CHASANOW
                             United States District Judge